CHARLES T. YOUNG *et ux. vs.* MARY LASSWELL.

AUGUST 7, 1957.

PRESENT: Condon, Roberts, Andrews and Paolino, JJ.

CONDON, J.  This is a bill in equity for specific performance of an alleged contract to sell a certain parcel of real estate in the town of Middletown in this state. After a hearing in the superior court on bill, answer and proof the trial justice denied and dismissed the bill on the ground that the evidence failed to show that the respondent had contracted to sell to the complainants. From the final decree denying and dismissing the bill of complaint, they have appealed to this court.

The principal contention under their reasons of appeal is that in the special circumstances in evidence respondent's real estate broker had authority to consummate a contract to sell her real estate and that such a contract was consummated with complainants as a result of a series of negotiations between them and the broker. Such contention raises an issue of fact that was peculiarly within the province of the trial justice to decide and his decision, in the absence of any misconception by him of the facts and the law applicable thereto, will not be disturbed by this court unless it is clearly wrong. We have carefully examined the transcript and we do not find that he has misconceived either the facts or the law, nor are we able to say after weighing all the evidence that his decision is clearly wrong. Our reasons for such conclusion are more specifically set forth in the following statement of the facts and the law as we understand them.

The respondent is the owner of the parcel of real estate in question known as the Old Fort Farm in Middletown. It consists of "Just under four acres," and situated thereon is a main dwelling of about ten rooms, a six-room bungalow, and a log cabin. The respondent bought the parcel in September 1945 and resided in the main dwelling until April 29, 1954 when she left to reside in Texas. Thereafter on March 10, 1955 she wrote to Francis X. Flannery and also to the White agency, real estate brokers in Newport, formally placing the entire property on the market for sale. In her letter to Flannery she wrote that she was sending Mr. Gus White of the White agency "essentially the same information this letter contains. I expect to put the property in the hands of one other topflight Newport agent within the next few days." In that same letter she also mentioned, as a possible purchaser, complainant Charles T. Young who had previously expressed an interest in the property if she ever placed it on the market for sale.

It is apparent from this correspondence that at this time

Flannery's relation to respondent was that of a mere broker who was given the opportunity in common with other brokers to find a purchaser ready, willing, and able to purchase on terms agreeable to respondent. Later as a result of negotiations by Flannery with Charles T. Young and also letters and telegrams from Flannery to respondent and her replies thereto, complainants claim that Flannery's relation as broker was transformed into that of an agent empowered to enter into a binding contract to sell.

They contend that such transformation resulted from the following events. By letter of September 23, 1955 Flannery informed respondent that complainants had made an offer of $35,000 if they could get a mortgage of $25,000. He wrote further that he had suggested they offer $40,000 and that respondent take the mortgage. He closed this letter with the question: "What is your pleasure?" The respondent replied on September 27, 1955 and among other things wrote: "As I understand your letter, he is offering $35,000 cash or $40,000 on terms, plus interest at 6%." She stated that she was "not averse to giving terms to any trustworthy and financially stable purchaser" but she wanted more information about the mortgage and what the actual offer was before she would consider the proposition. On October 10, 1955 he wrote respondent again to the effect that complainants were trying to obtain a mortgage from the bank and desired to purchase for $35,000 cash, and he added: "All this of course is contingent upon your approval."

Apparently up to this point there was no firm offer from complainants that they would purchase and no definite word from respondent that she would sell for $35,000 cash, and it is clear from the correspondence that Flannery was not clothed with authority to close negotiations at that figure nor do his letters indicate that he thought he was. Rather the indications therein were quite to the contrary. However, during the next ten days in October more cor-

respondence between him and respondent ensued and eventually brought matters to a head.

On October 13, 1955 Flannery wrote that complainants had submitted an offer of $35,000 and that they desired a yes or no answer by wire since they considered this offer as final. He urged respondent to accept it and assured her the sale could be completed in "one to two weeks time * * *." And he closed by saying: "Please name your attorney here, and send original of deed, if above is approved. Kindly wire answer." There is still no indication here that Flannery considered his relation to respondent other than that of broker.

Instead of telegraphing her answer, respondent wrote on October 16 that she would accept the offer of $35,000 but only for a part of the property which she roughly diagramed in her letter. She also wrote that in the event complainants insisted on purchasing the entire parcel she would "entertain an offer of $40,000.00" therefor, and that if they could not pay cash she would "consider a substantial cash payment and carry the balance myself with a first lien property note" at 5 per cent interest per annum.

In reply Flannery wired on October 18, 1955 as follows: "Client interested property entirety. Compromise offer $37,500. Will provide $12,500 you accept $25,000 mortgage twelve years at five percent. Terms as indicated your letter. Will sign contract immediately ten percent deposit. Answer=" This was an entirely new offer. It was not accepted by respondent. In reply thereto on October 19, 1955 she wired: "In order to reduce further dickering and bargaining will accept $39500," but terms of mortgage were not definitely indicated and apparently they were to be *considered* by her as stated in her letter of October 16, 1955.

However, Flannery apparently assumed that his suggestion of a $25,000 mortgage in his wire of October 18 was accepted, although respondent had never so indicated. Acting on such assumption he wired respondent on October 20,

1955 at 1:55 p.m. as follows: "Recommended price thirty nine thousand five hundred acceptable client Charles T Young for entire property stop received one thousand certified check good faith balance of ten percent deposit when contract is signed remainder exclusive of $25,000 mortgage when deed passes. Consumation on or before sixty days. Kindly acknowledge. Please telephone me Newport 5429 relative contract details eleven am or two pm Rhode Island time Friday="

On the same day respondent wired Flannery from Austin, Texas, at 12:30 p.m. as follows: "Request you withhold negotiations on sale of property until you hear from me will communicate with you shortly regards=" Later in the afternoon at 4:46 o'clock she telegraphed again as follows: "Since my very reasonable offer to your client contained in my wire of October nineteenth I received considerably better offer from another party which I have accepted my thanks to you and Mr Young for your consideration="

The complainants argue that the "special circumstances" surrounding these negotiations by Flannery plus his previous business dealings with respondent constituted him something more than a mere broker, and that he was in fact and in law authorized by her to make a contract to sell her real estate. Certainly there is nothing in the evidence here to show that Flannery had express authority from respondent to act as her agent and to make a binding contract to sell her real estate. He was unquestionably acting as her broker in negotiating with complainants but a broker is not clothed with such authority. Ordinarily his authority "is merely to find a purchaser ready, able, and willing to buy on the terms fixed by the principal; and he may enter into a binding contract of sale only when specifically authorized to do so." 12 C.J.S. Brokers §20, p. 58.

However, complainants contend that in the circumstances here Flannery had the implied authority, in addition to his authority as broker, to act as respondent's agent

to enter into a binding contract of sale. Such implied authority does not ordinarily arise out of the usual and customary acts of a broker in negotiating with prospects and seeking to obtain an offer to purchase on his principal's terms. 8 Am. Jur., Brokers, §61, p. 1018. We have been unable to find anything in the evidence here that would raise a necessary implication that Flannery had authority to bind respondent by *his* acceptance of any offer by complainants to purchase.

From the beginning of his negotiations with complainants it is clear that he was acting merely as a broker and was referring all suggestions to respondent for her approval or rejection. It is also clear that when she first placed the property in his hands she intended to give him no more authority than that of a broker. This is strongly evidenced by the fact that she did not give him an exclusive agency but placed the property in another real estate agent's hands at the same time and expressly advised Flannery of that fact. If at any time during the course of his negotiations with complainants his broker relationship with respondent became impliedly transformed into an agency with power to contract on her behalf with complainants, it could only have arisen from the exchange of telegrams between them on October 19 and 20, 1955 concerning a sale at $39,500.

In our opinion even those telegrams fail to disclose anything that could reasonably be held to imply that respondent had authorized Flannery to close a contract to sell at that price on the terms stated in his wire of October 20, 1955. Certainly, respondent's telegram of October 19, 1955 carries no such implication, although it might appear from Flannery's reply thereto of October 20 that he thought it did. That is not sufficient. To raise such an implication there should be reasonably clear evidence of some statements or conduct on the respondent's part from which the inference could be drawn that she had delegated to him the power to enter into a binding contract to sell. The trial

justice was unable to find from the evidence such an implied agency and, after carefully considering the transcript and the exhibits, that is also our conclusion.

The complainants' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Dean J. Lewis, Alexander G. Teitz,* for complainants.

*Sheffield & Harvey, Richard B. Sheffield,* for respondent.